Good morning, Your Honor. My name is John Desmond from the firm of Jones-Vargas for the Anonymous Online Speakers, and I'd like to reserve two minutes for rebuttal. The issue before you today is about protecting core First Amendment speech. What the Anonymous Online Speakers are doing in this case is no different than what pamphleteers did several years ago when they were anonymously expressing their opinions. The only difference is the medium of communication, simply because they're using the Internet in the blue light of their computers. Is there a major difference between commercial speech and other speech in this case? But, Your Honor, I don't believe that this is commercial speech, and I'll tell you why. All right. Under the central Hudson test, the United States Supreme Court looked at the core notion of commercial speech as in the speaker's economic interest, and that it's promoting the speaker's economic interest. There is absolutely no evidence before you that any of the blogs on that issue are in any way promoting the speaker's economic interest. So I don't believe that this constitutes commercial speech. When you look at how the United States Supreme Court has looked at commercial speech over the years, too, they've said that it's still subject to First Amendment protection, essentially what the – Simply lesser. Lesser, right. Essentially what the Fourth Circuit did in Letko. But isn't this a business speech? Well, that's how Quickstar is trying to portray it as a business speech. But the issue here is these are not, as they allege, team-related posts. There's been a real effort to say that any statement that says anything negative about Quickstar must be related to team or somehow team agents are co-conspirators. The only evidence before you is that these are anonymous posts. But it's not political speech. It's not religious speech. Why isn't it commercial speech? Because there's no – If it's not commercial speech, what is it? Well, I think there are categories of commercial and non-commercial speech. And there's non-commercial speech that may not be political or religious speech, but that still doesn't constitute commercial speech and which would still be entitled to greater protection than would be an intermediate level of scrutiny that might apply to commercial speech. But when you look at the Central Hudson case and the other cases in which the United States Supreme Court has discussed commercial speech, the core notion of commercial speech, it emanates from commercial advertising. It is one company advertising its product and seeking an economic interest in the speech through its communications. There's simply no evidence of that here. These are not – I don't believe that's a fair characterization of the speech at issue here. I think what you have, when you look at the record and the deposition transcript of Benjamin Dickey that was taken, you clearly have non-anonymous speech, which he was questioned extensively about, the team-related blogs and websites where he edits the content. You have the second category of speech, which is the anonymous online speaker speech. These are simply blogs that are making statements about a company based on these own individuals' experience with that company. That, in and of itself, does not make it commercial speech. Mr. Counsel, but most of these comments were posted on blogs that were either sponsored by TEAM or that were related to TEAM's interests. Isn't that correct? That's not correct, Your Honor. Where were they posted, then? They were posted on the individual blogs themselves. If you go to these websites, for instance, SaveUsDickDeVos.com Right, which is clearly related to Quick Start. Related to Quick Start, but not related to TEAM. And that's a critical distinction. Okay, but it was very clear that these websites were all there to criticize Quick Start in one way or another, whether they were established by TEAM or not. Correct, but the question is, do anonymous individuals have a right to criticize Quick Start or any other corporation? Are we entitled, let's say, to an in-camera hearing at which the district court could be told by Mr. Dickey who these people were, and then for himself he could identify whether they were former investors in Amway or not? Well, I think the danger with that, Your Honor, is the very nature of why Quick Start wants this information. They don't want the information to pursue a claim for damages. They want the information to out these people, to kill the speakers. I just asked whether we could do it in camera. Well, is it relevant, would it be relevant to us to know what the motivation was of these speakers? Would that be relevant to an inquiry as to whether this or not this was commercial speech? If it turns out to be Benjamin Dickey himself who posted these comments, would that be relevant to the plaintiff's case? I don't believe so, Your Honor, and here's why. I think when you look at the Cahill standard and why the court adopted the summary judgment standard that it did, it's to actually test the defamatory nature of the comments posted as a threshold showing before you would be entitled to that type of in-camera review. So to simply say, let's do an in-camera review, let's find out who these people are, and then explore what, if any, might their connection be to Benjamin Dickey or to Teem, you sort of reverse the burden, and you put the burden on Teem of somehow showing that these are non-anonymous or are non-defamatory. But under your sort of related, let me start with related to Judge Bybee, you have a protective order in place here. Correct. The protective order, as I read the record, was some fairly high protections, attorneys' eyes only, the typical protective order. So it could be done in a way where there would not be any public disclosure or use of the identity, correct? It could be, although the record is also replete with references to the protective order being violated. Well, but that would be a separate issue and risk that either Quickstar or its counsel would have to take. It would be, Your Honor. I guess the problem I have with the suggestion of an in-camera review is you're, in essence, revealing the identity of the speaker, maybe not publicly, but you're revealing the identity of the speaker and taking away their core First Amendment rights. Well, the reason I asked the question about the in-camera review was to try to get at trying to figure out how we determine whether this is, in fact, commercial speech. It's on websites that are critical of Amway and Quickstar that appears to be in Teem's interest. Teem has obviously had a falling out here. It appears to be in Teem's economic interest for Quickstar to fail. Well, I don't necessarily believe that that's true, Your Honor, because there's been an attempt to say that Teem is somehow a competitor of Quickstar. Teem is not a competitor of Quickstar. In fact, Teem was an approved Quickstar provider before this lawsuit was filed and the dispute occurred between the companies. Teem's in a very different line of business. Teem is not a direct competitor of Quickstar, which is another reason that I don't believe this constitutes commercial speech. But to answer your question about how do we determine whether this is commercial speech or not, I think when you look at Central Hudson and other Supreme Court cases that are instructive, the court focuses on the nature of the speech itself. I mean, there's actually three criteria that the courts have looked at. Speech, which does no more than propose a commercial transaction. Second, whether it references a specific product. And then third is the whether the speaker has an economic motivation for the speech. The Supreme Court has said that's that economic motivation. How do you uncover that? But by the nature of the statement itself, if you look at none of it, I think Judge McCune as well, is why if you use an in-camera proceeding, don't you get at that very question? But I think that's the whole point of doing it in-camera to say, OK, what's the nature of it? I guess the danger with the in-camera proceeding, Your Honor, I think you can get it to the same question by looking at the speech. With an in-camera proceeding, you are revealing the identity of that anonymous individual, maybe not publicly, but at least to the court and to the attorneys and the parties. But where has it ever said that anonymity extends? Absolutely. It never said that. And so in the First Amendment context, even in the most protected speech, political and otherwise, the court is often balancing interests, isn't it? There's no question that you're balancing interests. And I think that's what the Cahill Court would be. In order to get a more precise answer or at least to see where you are, you would do it under very strict disclosure and that would not be identifying. Really, it would not be a public identification. It wouldn't undermine the anonymity, would it? Well, it might because that individual is no longer anonymous to the court of the parties. What if it's Mr. Dickey? What if it's Mr. Dickey? Yeah. Well, I don't I don't believe that Mr. Dickey, simply by being an employee of TEAM, gives up any First Amendment rights that he may have to First Amendment speech over the Internet. What if I put something out on the Internet and you're probably familiar with cases where, for example, somebody essentially defamed some young women who were going to Yale Law School and I put that out anonymously, but then I tell Judge Thomas, actually, it was me, but don't tell anybody. Have I in any way diluted my claim to anonymity? I don't believe you have because the Supreme Court has never required that a speaker be anonymous to the entire world. If you go back to the Watchtower case or the McIntyre case, the pamphleteering cases, there is evidence in those cases that the printer knew the identity, that friends and neighbors who may have assisted in dissemination of the pamphlets knew the identity of that individual. So simply because Judge Thomas may know your identity does not waive any First Amendment rights to anonymity. So what does his role need to be to put me in a position where I don't dilute my anonymity? What is Judge Thomas's role? Well, I think if he is in some way assisting you in putting that speech out there. And so if he has some role in that process, much like the printer in the pamphleteering cases may have, you're giving up your... Well, we would have to know that then. In other words, we'd have to figure out what my relationship is in some, in camera or some other way, so we'd know whether I had diluted it, wouldn't we? I mean, you can't just on the basis say, sorry, you get to keep your anonymity. We won't, we won't even look into the situation of what or why you told Judge Thomas or his role. I think you would have to explore. And I think those types of questions, when you look at the district judge's orders are permitted. I mean, what he talked about was, you know, he set two standards of here's the imposed on anonymous speech, and then here's the standard for non-anonymous. And I think he was very sensitive to balancing those interests. So I think... Well, he balanced them and he said that Mr. Dickey has to disclose certain items if he knows them, correct? Correct, he did. And now you've filed this mandatement. Well, where did he go wrong? Where he went wrong... What's the legal error in your view? We believe the legal error is in the application of the Cahill standard, which Cahill isn't a Ninth Circuit case. No, clearly it's not. So bear with me a minute. You're hearing mandamus. One of the requirements is there has to be clear, plain error of law. Cahill has been applied by many courts, but it's an out-of-circuit case. We don't accept, unless you, I guess you can count the more recent Perry decision. We don't have anything that's precisely on point. So where's the clear error of law? Where did the district court make such a huge error that we would have to swoop down and mandamus and say, you've got to stop this. The clear error was in application of the standard that the district court adopted, and it was up to the district court. But if our standard is undefined in the circuit, how can there be... Well, no, the clear error was in the application of that. If you unmask the identity of these bloggers and they lose their first amendment protection, you cannot replace that. You cannot give them back their anonymity. But that's the same argument one might say, attorney-client privilege, any other privilege that you have, right? Well, but I think it's different here when the only protection they have is their anonymity and where there's been a concerted effort to root out who these people are to punish and chill others from speaking. As you've seen, there's no question that there's been a lot of posts about this dispute or a dispute. Can I tell you my concern is that I hear your argument and I think, you know, from the Supreme Court's gone on, anonymous speech, starting with political speech. But taking your argument to its application here, it would seem you could never uncover the anonymous speaker. Absolutely. I think you can. I think under the district court's standard, they said, if you can show... Well, the district court gave a standard, and now you're saying he applied the wrong, that there was the wrong standard by the district court. Well, we don't believe that the statements that he ordered Mr. Dickey to testify about are in any way capable of defamatory construction. So that is what we believe is the clear errors in the application of that standard that somehow these statements are capable of a defamatory construction. If we disagreed with you and we thought that they were in the realm of defamatory construction, then would you have any other argument to preclude the disclosure? Other than their First Amendment rights, no. If you believe, if you agree that they were capable of a defamatory construction, we would have an additional argument. When you look at the standard under Cahill, it's to satisfy, survive a summary judgment motion. The claims here are tortious interference with contract and tortious interference with prospective economic advantage. There's absolutely no evidence in the record that any IBO resigned from Quickstar saying, I read any of these blogs and that caused me to either resign or somehow change my position. The only testimony you have before you in the two declarations from Mr. Vandeven are that IBOs left Quickstar. There's been no attempt to make a causal link to any IBO leaving with any blog or statement that they may have read over the internet. So yes, I do believe that under application of the standard, it could not survive summary judgment based on any analysis of causation. Thank you, counsel. Thank you, Your Honor. May it please the Court, Senator Chau on behalf of Quickstar. This case is about whether a named defendant's team has the First Amendment privilege to block discovery of its own actions, its own speech. This case is also about whether the online speakers can use the First Amendment to silence a recipient witness, Mr. Dickey, from testifying by his knowledge of the identity of the speakers who we believe, and it's a theory of our case, these members or directed by team. The court's decision below was guided by Dover's as Cahill. We believe that was error. Cahill does not apply. And a very key distinctions, the recipient witness here is not an ISP. It is Mr. Dickey. So are you saying, are you confessing that the district court made a clear error of law? Yes. Yes, Your Honor. In addition, another distinction, Your Honor, Cahill is that. I understand the difference is one might draw on Cahill, but if that's the case, then we wipe out the order and go back to square one with the district court, right? I think. You can't have it both ways on that one. I think, Your Honor, that guidance from this court would be helpful. There clearly was some confusion below in terms of does Cahill apply? We believe he doesn't apply. He doesn't apply at all. And we've laid out various grounds for that in our briefs. What do you think the standard is for the district court to determine whether or not the anonymous identity, if you will, should be disclosed? I think the electrical case from the Fourth Circuit is directly on point, Your Honor. Except that's not controlling law either. That's not controlling law. And that's right. Your court has to make that determination. But that is the only case we're aware of. Well, Perry, I suppose, it's a different context in our circuit, but that's the most recent pronouncement on anonymous speech. Perry v. Schwarzenegger. I'm sorry. Perry v. Schwarzenegger. I'm sorry. Perry v. Schwarzenegger. I'm not prepared on that. I would like to speak on Lefkoe, though, Your Honor. Right. Let me ask the same question that I asked you. I mean, if the district court is debating standards, and certainly Perry hadn't come out by that point, and it may or may not be applicable in this context, what's the clear error in when the district court says, all right, I'm going to go through the various standards the courts will apply. Here's the standard. I'm going to apply it. Here's the balancing. I'm going to go forward. I mean, on a mandamus, you have to have a clear error of law. And there's no established law at the time. So it's hard to see clear error. Well, Your Honor, there was no basis for the Cahill decision under these circumstances. And I do believe the court below, there will need to be some guidance from this court. But you know what? We're kind of in this. You have your cross motion for a mandamus, although you didn't in your brief discuss the Bauman, in your opening brief, the Bauman factors. If the court went through all of these things and said there are various potential standards, isn't the Cahill standard the most stringent of the standards that the court looked at? It is, although there is a Dendrite standard, Your Honor, which I think adds another factor of balancing. Which one? The Dendrite. Oh, okay. Is that from New Jersey? Yes, it is, Your Honor. Right. So if, but if, if they, these are Dendrite and Lefkoe are both non-party witnesses who are not ISPs, is that right? They are, they are actually DOE defendants, right? In the Cahill case and the Dendrite case, they are DOE defendants. But they're not ISPs. They, they are not ISPs. They are not ISPs. Okay. So one of the issues in all of this is whether commercial speech is involved. And your opposing counsel says, you know, it's not clear to them that this is opposing, that this is really commercial speech. What is your response to that? It is commercial speech. And let's put aside for the moment what is misleading commercial speech, because if it is misleading, then it's not protected at all. It is, it is commercial speech. The test on the central Hudson, two prongs. Second prong being, does the speech propose a commercial transaction? There is evidence in the record, as one of the, a member of the panel suggested at ER 711, that they was an admission by a team that they were a competitor. In the circumstances in this record, there is evidence that, substantial evidence in the theory of the case, is that there was a break between team in August 2007. And there was a split. And the leaders of team left QuickStar. And they have in their, we call it sort of a multi-level marketing organization. They have a number of independent business owners underneath them. And they needed to convince these IBOs to leave QuickStar and follow them. And to follow them on to the next multi-level marketing company. And that's in the record at ER 6667. I understood that both QuickStar and team were multi-level marketing companies. Mr. Desmond said that he did not think that they were competitors. Is that because they're selling different products? Well, he's referring to the fact that the team organization sells business support materials. But what he fails to add is that team then was searching for another multi-level marketing company. And they ultimately went to another company. And they brought, they were in competition for the sales force. Team needed these IBOs to take with them to the next retailer. And with that sales force. The competition here was not over laundry detergent. It was over a sales force. A sales force, precisely. And a sales force is a sales force and also a customer base. Because in a multi-level marketing company, many of the IBOs will purchase the product as well as sell the product. And it is a commercial speech. It is a commercial setting. Because it's a sales force and evidence is in the record of over 25,000. So over 25,000 IBOs in a three-month period of time left QuickStar. So is your theory kind of a commercial disparagement coupled with rating? One can put it that way. It's both disparagements, denigration. Some of the comments arise independently actionable to be defamatory. And that's what happens on the negative side. On the positive side. We do have some Ninth Circuit case law that suggests even in the commercial context that to rise to the level of actionable speech it needs to be defamatory. So why would we have to abide by that? Well, I wonder if I could finish. But the thought, just to finish your earlier question, is it's not only denigration of QuickStar, but it's also praising team and its leaders and also encouraging people, leave QuickStar, come with us, and we will go to the next multi-level marketing company. All right. Well, you've talked about commercial disparagement and other actions. But you pled towards this interference. Correct. And they say you can't show that anybody left. And, therefore, you can't prevail if they apply. If we apply the standard that the district court did, you can't survive summary judgment. What's your response? In fact, the declarations, there are three declarations of Mr. Gary Vandervan. Two of the first two declarations were before the district court at the time that it issued the April 9th decision. And in those declarations, Mr. Vandervan says that these are a series of statements he went through. Here's a series of statements in these websites. They're false. And then he also said, as a result of this, that this injures our reputation. It hurts our ability to retain IBOs. IBOs are then motivated to not renew their annual distribution contract. And they're also motivated to terminate. Mr. Vandervan also said that in the three years, I think it's three years, immediately preceding August 2007, which is when TEAM split and left, in those three years they had somewhere between 100 and 200 letters of resignations. But in the four months following August 2007, which coincided with the Internet and its campaign, by TEAM, in those four months, over 25,000 people left. And they left, and they went to join TEAM, and they left QuickStart. They actually, instead of just letting their membership lapse, they actually sent in resignation letters. And that's the key, that's the heart of the case. And that's the evidence that we're trying to get. And we're sort of still at the ground zero after two years of litigation. But, you know, if you go back to cases where speakers say, like, a consumer's union, but then you make somebody anonymous and they're just basically criticizing and they're disparaging about the kind of the Amway setup and that sort of thing, how do you distinguish some of the speech in this case, which might be akin to that just basic criticism, which is not commercial speech, with having it be commercial speech? How do we draw the line, and how does the district court try to figure out what box it falls in? Let me draw an analogy. If I'm a consumer of Toyotas, and I go on a website and I say, gee, I wonder what's happening with my brakes, and you comment on it. And it could be negative commentary. That's not what we're talking about here.  Go on to the blogosphere. Go on a website. Set up websites. In fact, we'll help you set up websites. And criticize them. Encourage people to buy our product. And by the way, don't disclose you're affiliated with Ford. That's our situation. And that is not, you know, that's very much our situation. And that's why this distinguishes us. So if I understand your argument, you really are urging us to grant the writ. Yes, we are. In other words, you agree with them? I mean, they've asked for a writ of mandamus saying that the district court was wrong in ordering disclosure of a couple of these websites and that Mr. Dickey has to testify. And you're saying he shouldn't have to testify. Well, one of the errors that I wanted to underscore for the court is that the district court took Cahill and actually applied Cahill and sort of went beyond Cahill. Right, but why couldn't that be remedied on appeal, that sort of error, under regular appeal as opposed to extraordinary writ? I mean, legal errors can be corrected on appeal. Writs are not generally used to say, ah, no, we wish you'd used a different rationale. Well, that's right. But I think this court has actually entertained writs in discovery context where the issue is a novel issue. And in this circuit, the competing interest of litigants and their ability to get discovery, both basic discovery to prove the case and the asserted right of somebody saying, you know, I have a First Amendment right, that's not consquirely addressed in this circuit. We're kind of mixing and matching their mandamus petition with yours. So yours, the district court has denied you access to some additional potential anonymous speakers, correct? Yes, but it's something actually perhaps more fundamental, is in the district court's opinion, the district court assumed that Teem, which is a known defendant, it's not a go defendant, it's a known defendant, and the district court assumed that Teem and its employees were entitled to write as anonymity. And no case that we're aware of has ever provided a known defendant to withhold evidence of its own conduct. But, you know, they basically denied some discovery, which goes on all the time. Sometimes it's an attorney-client. I mean, the Supreme Court just said in the attorney-client context you can't even, you know, come up. There may be, you know, an appeal, there may be some potential for mandamus, but it's a pretty narrow window where you can get appellate relief just because the district court denied some discovery. Do you have any other comparable case that you would point us to? Not off the top of my head, Your Honor. You have about 12 seconds left, so is that all right? Then if I may conclude, we believe the ‑‑ we do believe that the Lefko case is directly on point, Your Honor. And to the extent that there is any concern with a truly independent witness, and we're not sure we have that here, we don't believe there is, but if there were, that could be handled by the procedures adopted by the district court in Lefko, which is the protective order. Thank you very much. Thank you very much. The case just heard will be submitted for decision. I'm sorry we used up all your time in the first go-round with our questioning, and we're on a little bit of a tight schedule today, so we don't have time for rebuttal. I want to thank all the counsel who participated today. It's not easy to argue in front of a law school audience. The students may think so, but it is very difficult for counsel. So perhaps we should break the protocol and give them a little bit of applause.
judges: Thomas, McKeown, Bybee